IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SHEET METAL WORKERS' | : | CIVIL ACTION |
| INTERNATIONAL ASSOCIATION | : | |
| LOCAL UNION NO. 19 | : | No. 11-1025 |
| | : | |
| v. | : | |
| | : | |
| MAIN LINE MECHANCIAL, INC., et al. | : | |

## MEMORANDUM

Juan R. Sánchez, J.                                                         March 7, 2013

Plaintiff Sheet Metal Workers' International Local Union No. 19 (Local 19) brought this action pursuant to section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, to confirm an arbitration award against Defendant Main Line Mechanical, Inc. (Main Line) and to hold Defendant Sands Mechanical, Inc. (Sands) jointly and severally liable for the award as the alter ego of Main Line. This Court previously confirmed the arbitration award against Main Line. The only remaining issue—whether Sands is also liable for the arbitration award as the alter ego of Main Line—proceeded to a one-day, non-jury trial on July 16, 2012. Pursuant to Federal Rule of Civil Procedure 52(a), this Court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

Local 19 is a labor union representing workers in heating, ventilation, and air conditioning (HVAC) installation and repair, among other trades. The Sheet Metal Contractors Association (SMCA) is an association of employers designated to represent all employers in the sheet metal industry within an identified geographical area. Local 19 and SMCA negotiated a collective bargaining agreement (CBA) covering Philadelphia, Bucks, Montgomery, Chester,

and Delaware Counties in Pennsylvania, and Camden, Gloucester, and Salem Counties in New Jersey. The CBA binds all members of the SMCA as well as other non-members who have agreed to be bound by the agreement.

Main Line is a now-defunct contractor whose main work involved HVAC installation. Main Line was incorporated on May 2, 1996, in the State of Delaware. Its sole office was located at 228-B Bristol Pike, in Bristol, Pennsylvania. Leonard Santos (Santos) was the minority owner of Main Line and served as the company's President. As President, Santos performed many duties including placing orders for materials, providing estimates, bidding jobs, drawing up contracts, establishing lines of credit, and completing billing and payroll. Santos's wife, Helen Santos, owned the remaining shares of Main Line and served as CEO, working two days a week, four hours per, day doing administrative tasks.

On April 11, 2002, Main Line became a signatory to the CBA between Local 19 and the SMCA.[1] This CBA was effective through April 20, 2004. Main Line subsequently signed similar CBAs effective from May 1, 2004, through April 30, 2007, and from May 1, 2007, through April 20, 2010.

Under the terms of the CBA, a signatory employer performing work covered by the CBA could hire only union workers; the employer could not evade the CBA by setting up another business to do work covered by the CBA; when the employer did work of the type covered by the CBA under its name or the name of another, the CBA applied; and when working in the jurisdiction of another local union affiliated with the Sheet Metal Workers International Association (SMWIA), the employer was allowed to employ two Local 19 workers, but had to

---

[1] A few weeks earlier, on March 23, Main Line made its first contribution payments to Local 19's benefits fund in anticipation of becoming a signatory to the CBA.

hire the rest of its workforce from the local union of that jurisdiction and abide by the terms of that local union's CBA.

Sands is also an HVAC contractor located in Bristol, but is not a signatory to the CBA. Sands was incorporated on February 20, 2002, with the stated purpose of doing HVAC installation work. Santos is a minority owner of Sands and, was at all relevant times, its President. Helen Santos owns the remaining shares of Sands. Sands maintains its office at 228-D Bristol Pike, Bristol, Pennsylvania. Santos formed Sands to take advantage of business opportunities in Northern New Jersey, where he was born and raised. Sands was incorporated eight months to a year after it actually began operation. Santos decided to incorporate Sands in order to register the corporation as a "minority owned" company with Helen Santos as the sole owner so as to obtain preferred status for bidding on certain jobs. This registration was not pursued beyond the initial filing, which was rejected. Helen Santos remains only a majority owner. Sands operates as a non-union company, having never become a signatory to any collective bargaining agreement.

At Sands, Leonard and Helen Santos performed similar duties to the duties they performed at Main Line. No personnel other than the Santoses worked for both companies at the same time, and only four Main Line employees eventually went to work for Sands. Alexander Rabinovich, Sergei Souk, Tomislav Panic, and Louis Perez were members of Local 19 and were employed by Main Line while it was a signatory to the CBA. At some point, each of these four relinquished his union membership and went to work for Sands. Rabinovich went to work for Sands in 2002, years before Main Line had ceased its HVAC operations. Each of these four employees performed similar roles at both companies: Rabinovich served as a general

supervisor; Souk and Panic served as site supervisors, reporting to Rabinovich; and Perez worked as a technician.

Sands and Main Line maintained separate, unconnected offices. They also kept independent corporate records and separate finances, and each maintained all other corporate formalities. Sands operated as a "prevailing wage" contractor in Northern New Jersey, and never undertook any contracts within Local 19's jurisdiction while Main Line was an active HVAC installation business. Sands and Main Line did not share equipment. They did not service the same customers, with two possible exceptions. Both entities sold equipment to Main Line of Virginia—an entity performing HVAC work in Virginia also owned by Helen Santos—but did not perform any fabrication or installation for that company. Sands completed two jobs for Harkins Builders, and Main Line may have performed one job for Harkins Builders, although Santos testified that job was actually handled by Main Line Fire Protection, Incorporated, a separate company that does not perform HVAC work.

In 2005 or 2006, Main Line performed its final HVAC job in Bethlehem, Pennsylvania. Main Line was fired from the job for poor performance and was ultimately sued. Santos attributes this result to the sloppy and inefficient work of the Local 19 members he used on the job. By 2006, Main Line had ceased performing HVAC jobs and only did business buying and reselling equipment.

With Main Line effectively defunct and frustrated with Local 19, Santos bid for a number of HVAC jobs on behalf of Sands in Local 19's territory. Sands performed only one job within Local 19's jurisdiction—a low income housing development called the Delaware County Fairgrounds. Sands did not take over any jobs from Main Line when Main Line ceased

operating. Santos contends neither Sands nor Main Line ever subcontracted a job to the other. This appears to be true, with one possible exception.

In late 2009, Sands was awarded a contract to do HVAC and plumbing work at the Fort Dix military base in Burlington County, New Jersey. In January 2010, Bryan Bush, a Local 19 business agent, began investigating work being performed at the Fort Dix job site following a phone call from Bryan Camp, a business agent for SMWIA Local 27, Local 19's sister union in Southern and Central New Jersey. Camp believed some work being done at Fort Dix had been subcontracted by Main Line to Sands. As part of the investigation, Bush and another Local 19 business agent, Patrick Kennan, visited Santos at Main Line's office. Santos informed them that only Sands was involved with the Fort Dix job. Bush and Kennan also visited the Fort Dix job site, where they spoke with job site superintendent Randall Gartner of Harkins Builders and Sands employee Tomislav Panic. At the job site, Bush and Kennan viewed and took photographs of equipment labeled "Main Line Mechanical." This equipment consisted of two out of three gang boxes and three of twelve ladders. Approximately nine ladders and one other gang box were either labeled "Sands" or unlabeled. Santos and Rabinovich credibly testified in their depositions, however, that Sands had purchased the ladders from Main Line after Main Line ceased doing HVAC work.

Local 27 filed a union grievance against Main Line, Sands, and Santos regarding the Fort Dix job, which was submitted to arbitration. None of the three respondents participated in the arbitration. The arbitration panel found Main Line had subcontracted work to a nonunion employer (Sands) in violation of Local 27's CBA and ordered Main Line and Santos, but not Sands, to pay local 27 $349,859.90 in damages. Local 27 sought confirmation of the arbitration award in the New Jersey federal district court, which confirmed the award against Main Line but

not Santos. *See Sheet Metal Workers' Int'l Ass'n Local Union 27 v. Main Line Mech., Inc.*, No. 10-01873, 2010 WL 4269435, at *11-13 (D.N.J. Oct. 25, 2010). Main Line argued in the district court that it had no connection to the Fort Dix job and that Sands had bid on, and been awarded, the job and performed all the work. The district court rejected the argument because it had not been made before the arbitration panel. *Id.* at *11. This Court, however, is not bound by the finding of an arbitration panel after a hearing at which the defending party does not participate because a default judgment resulting from a party's failure to defend altogether does not have issue preclusive effect. *Matter of McMillan*, 579 F.2d 289, 293 (3d Cir. 1978). Based on the evidence produced at trial, this Court finds Main Line, which was no longer performing HVAC jobs at the time the Fort Dix contract was awarded, did not subcontract the Fort Dix job to Sands. Rather, Sands directly obtained the contract for that job.

On February 3, 2010, Local 19 filed a grievance against Main Line, alleging the work performed at the Fort Dix job was in violation of the Local 19 CBA. On May 19, 2010, Local 19 and Main Line participated in an arbitration before the Philadelphia Joint Adjustment Board (JAB). The JAB concluded Main Line had evaded the Local 19 CBA in some way through its relationship with Sands. The JAB provided scant explanation of its decision and did not explain exactly how Main Line evaded its obligations.[2] The JAB did not address whether Sands was the

---

[2] The JAB did not issue a full written decision. The following excerpt from the hearing minutes is the JAB's only written explanation for its decision:

> After extensive deliberation and review of the evidence provided by the parties, the Joint Adjustment Board concluded that there was sufficient evidence to support that an evasion of the terms of the [CBA] exists to support a decision that Main Line Mechanical is in violation of Article II, Section 12 of this CBA. Evidence presented documented that Leonard Santos, owner of Main Line Mechanical, is/was 70% owner of Sands Mechanical. Sands Mechanical is not a signatory to the Local #19 CBA[,] or any other SMWIA [CBA].

6

alter ego of Main Line, although Local 19 argued that point during the arbitration hearing. The JAB assessed damages against Main Line in the amount of $202,237.56, but did not assess damages against Sands or hold Sands liable for the award against Main Line.

On February 10, 2011, Local 19 brought the instant action seeking confirmation of the JAB award and an order holding Sands jointly and severally liable for the award as the alter ego of Main Line. On January 31, 2012, this Court confirmed the arbitration award against Main Line and denied Main Line's motion to vacate the arbitration award. The sole remaining issue of Sands's alter ego status proceeded to a non-jury trial on July 16, 2012.

**CONCLUSIONS OF LAW**

As a threshold issue, Sands argues because the arbitration award has been confirmed, there is no longer a basis for federal subject matter jurisdiction as the alter ego issue is essentially a state law veil-piercing claim. Courts have found a claim that an entity is liable for its alter ego's violation of federal labor and employment laws presents a question of federal law. *See, e.g.*, *I.B.E.W., Local Union No. 5, AFL-CIO v. Krater Servs., LLC*, No. 08-63J, 2011 WL

---

Trial Ex. 6, at 9. Article II, Section 12 of the CBA provides:

> The Employer agrees that no evasion of the terms, requirements and provisions of this Agreement will take place by the setting up of another business to do work covered by this Agreement, or in any other way attempt to or actually evade or nullify responsibility hereunder. If and when the Employer shall perform any work of the type covered by this Agreement, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer through its officers, directors, partners or stockholders, exercise either directly or indirectly control of management and/or labor policies of such other entity, the terms and conditions of this Agreement shall be applicable to all such work.

Trial Ex. 3, at 3. Given the vagueness of the JAB's explanation, and the breadth of Section 12, it is unclear how exactly Main Line evaded its CBA obligations through its relationship with Sands. What is certain is that the JAB's decision cannot be considered an adjudication that Sands is the alter ego of Main Line.

7

1136797, at *16 n.12 (W.D. Pa. Mar. 25, 2011) (finding the court had subject matter jurisdiction over an LMRA alter ego claim); *Brown v. Astro Holdings, Inc.*, 385 F. Supp. 2d 519, 525 (E.D. Pa. 2005) (holding an ERISA alter ego claim presents a federal question because it alleges direct liability of a single enterprise, whereas a veil-piercing claim seeks to impose vicarious liability on a distinct entity for another's debt); *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. A&M Heating, Air Conditioning, Ventilation & Sheet Metal, Inc.*, 314 F. Supp. 2d 332, 339 (S.D.N.Y. 2004) (holding the court had jurisdiction over an LMRA claim asserted under a theory of alter ego liability). Following the rationale of these cases, this Court finds it has subject matter jurisdiction over Local 19's alter ego claim.

The traditional corporate alter ego test places an extremely high burden on plaintiffs attempting to pierce the corporate veil. *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001) (observing the burden of proving alter ego under the traditional test "is notoriously difficult for plaintiffs to meet"). This test requires courts to examine the following factors that indicate alter ego status: "gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder." *Id.* at 484-85. "Thus, in order to succeed on an alter ego theory of liability, plaintiffs must essentially demonstrate that in all aspects of the business, the two corporations actually functioned as a single entity and should be treated as such." *Id.* at 485.

In claims pursuant to the National Labor Relations Act (NLRA), however, the standard for establishing the existence of an alter ego is less burdensome. *See id.* at 486 (noting the test used in NLRA cases is "demonstrably easier on plaintiffs than traditional veil piercing"). Under

the NLRA, "[t]he focus of the alter ego doctrine . . . is on the existence of a disguised continuance or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or a technical change in operations." *N.L.R.B. v. Al Bryant, Inc.*, 711 F.2d 543, 553 (3d Cir. 1983) (quotation omitted). The key factors in this alter ego analysis are "whether the two organizations have substantially identical 'management, business purpose, operation, equipment, customers and supervision, as well as ownership.'" *Trafford Distrib. Ctr. v. N.L.R.B.*, 478 F.3d 172, 179 (3d Cir. 2007). No single factor is dispositive. *N.L.R.B. v. Omnitest Inspection Servs., Inc.*, 937 F.2d 112, 118 (3d Cir. 1991). Rather, the factors must be viewed together to determine if the two employers are "the same business in the same market." *Id.* (quotation omitted). This Court finds the alter ego test employed in NLRA cases, rather than the traditional veil-piercing analysis, should be applied to Local 19's LMRA claim. *See Operative Plasterers & Cement Masons Int'l Ass'n Local 8 v. AGJ Constr., LLC*, No. 08-6163, 2009 WL 2243900, at *5 (D.N.J. July 24, 2009) (applying NLRA alter ego test to LMRA and ERISA claims). However, because Local 19 has failed to establish Sands is the alter ego of Main Line under this less burdensome test, it likewise has not established an alter ego relationship under the traditional veil-piercing analysis.

Although Local 19 has shown Sands and Main Line have "substantially identical" ownership and management, it has failed to establish substantially identical supervision, business purpose, operations, equipment, or customers. Santos appears to have managed the business of both companies, but the supervision of the companies' day-to-day operations was never performed by the same person (or persons) during the same period of time. Alex Rabinovich, Sergei Souk, and Tomislav Panic worked as supervisors for both Main Line and Sands, but all three left Main Line before they began working solely for Sands, and Main Line continued to

operate after their departures with other supervisors. As to business purpose, although both companies engaged in HVAC installation, their businesses were notably different in several respects. Sands works primarily in multi-unit residential buildings installing small HVAC units in each residence. Main Line, on the other hand, performed jobs at hotels, schools, nursing homes, and other buildings requiring large rooftop heating and cooling units. Moreover, the companies operated in distinct geographical areas. Santos created Sands to take advantage of the connections he had in Northern New Jersey, and Sands worked primarily in that region. The record shows Sands only performed one job in the geographical market covered by Main Line's CBA, and it performed that job in 2007, well after Main Line had ceased its HVAC installation operations.

In terms of business operations, each company maintained distinct offices in the same building complex, and at no point did the two share an office. Significantly, apart from the Santoses, the companies at no time shared the same employees, and only four workers from Main Line ever went to work for Sands. The only evidence of common equipment was a few ladders and gang boxes at the Fort Dix job site labeled "Main Line Mechanical." At least some of these items, however, were sold to Sands by Main Line after Main Line ceased doing HVAC installation.

As for shared customers, the record shows Main Line and Sands had only two common customers, Main Line of Virginia and possibly Harkins Builders. Neither company performed any labor for Main Line of Virginia, but simply sold it equipment. Santos also testified that

Main Line Fire Protection, Incorporated, and not Main Line Mechanical, performed the job for Harkins. The companies also never subcontracted work to each other.[3]

In sum, the evidence shows Main Line and Sands did not share substantially identical supervisors, business purposes, operations, equipment, or customers. The fact Santos owned and ran both businesses, alone, is simply not enough to show Sands and Main Line are "the same business in the same market." *Omnitest*, 937 F.2d at 118; *see also Crest Tankers, Inc. v. Nat'l Mar. Union of Am.*, 665 F. Supp. 1431, 1435-37 (E.D. Mo. 1987) (finding two maritime shipping companies were not the alter egos of their sister shipping company, even though they all shared substantially identical ownership and management, because they did not share the same equipment, supervision, or customers, and because they did not share a substantially common business purpose despite having some overlap in their shipping operations).

Local 19 argues Sands's intended purpose was to evade the CBA, citing the fact that, after the Bethlehem job, Main Line ceased operating as an HVAC installer and Sands began bidding on jobs in the territory covered by Main Line's CBA. Sands, however, only performed one such job. Although Santos stated he decided to bid on that job out of frustration with the union, this does not demonstrate Sands is the alter ego of Main Line without other evidence suggesting "the existence of a disguised continuance or an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or a technical change in operations." *Al Bryant, Inc.*, 711 F.2d at 553. Rather, the evidence contradicts the position that Sands was created and used to evade Main Line's CBA obligations. Sands was in operation for several years before Main Line ceased HVAC operations, and had been doing business for almost a year

---

[3] Even if this Court were to agree with the default judgment finding of the New Jersey arbitration panel that Main Line subcontracted the Fort Dix job to Sands, it would still not demonstrate the level of integration required to find an alter ego relationship.

before Main Line first became a signatory to the Local 19 CBA. Although the JAB found Santos's ownership of Sands somehow constituted a violation of the CBA by Main Line, there simply are not enough facts to show Sands was the alter ego of Main Line.

For the foregoing reasons, judgment is entered in favor of Sands and against Local 19. An appropriate Judgment follows.

BY THE COURT:


 /s/ Juan R. Sánchez
Juan R. Sánchez